**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| SIERRA CLUB, | |
| *Petitioner*, | Case No. 25-1177 |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE M. ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency, | |
| *Respondents*. | |

## PETITION FOR REVIEW

Pursuant to Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1), Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, Sierra Club hereby petitions this Court for review of the final action of United States Environmental Protection Agency published at 80 Fed. Reg. 31,470 (June 3, 2015) and titled "Completion of Requirement to Promulgate Emissions Standards" ("Notice of Completion") (Attachment 1). Although filed more than 60 days after EPA promulgated the Notice of Completion, this petition is "based solely on grounds arising after such sixtieth day," 42 U.S.C. § 7607(b)(1): President Trump's signature into law, on June 20, 2025, of S.J. Res. 31, of a joint resolution of Congress, adopted under the Congressional Review Act ("CRA"), disapproving

EPA's final action published at 89 Fed. Reg. 73,293 (Sept. 10, 2024) and titled

"Review of Final Rule Reclassification of Major Sources as Area Sources Under

Section 112 of the Clean Air Act."

DATED: August 19, 2025     Respectfully submitted,

*/s/ James Pew*
James Pew
Earthjustice
1001 G. St., NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for Sierra Club*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIERRA CLUB,

        *Petitioner*,

    v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY and LEE M. ZELDIN, in his
official capacity as Administrator of the
United States Environmental Protection
Agency,

        *Respondents*.

Case No. 25-1177

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Sierra Club makes the following disclosure:

Sierra Club is a non-profit corporation organized under the laws of the State of California. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

Sierra Club does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club.

DATED: August 19, 2025                    Respectfully submitted,

/s/ James Pew
James Pew
Earthjustice
1001 G. St., NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for Sierra Club*

# CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August, 2025, the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statement** were served on Respondents by sending a copy via First Class Mail to each of the following addresses:

Lee M. Zeldin, Administrator
Office of the Administrator (1101A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Pamela Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Correspondence Control Unit
Office of General Counsel (2310A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*/s/ James Pew*
James Pew



**ATTACHMENT 1**


revision of the enforcement period in 33 CFR 165.1312(d). This rule is categorically excluded from further review under paragraph 34(g) of Figure 2–1 of the Commandant Instruction. We seek any comments or information that may lead to the discovery of a significant environmental impact from this rule.

## List of Subjects in 33 CFR Part 165

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

## PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREA.

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 33 U.S.C. 1231; 50 U.S.C. 191; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Department of Homeland Security Delegation No. 0170.1.

■ 2. In § 165.1312 revise paragraph (d) to read as follows:

### § 165.1312 Security Zone; Portland Rose Festival on Willamette River.

\* \* \* \* \*

(d) *Enforcement period.* This section is enforced annually in June. The event will be 6 days in length and the specific dates of enforcement will be published each year in the **Federal Register**. In 2015, the zone will be enforced on Wednesday, June 3, through Monday, June 8.

Dated: May 11, 2015.

**D.J. Travers,**

*Captain, U.S. Coast Guard, Captain of the Port, Sector Columbia River.*

[FR Doc. 2015–13397 Filed 6–2–15; 8:45 am]

**BILLING CODE 9110–04–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 63

**[EPA–HQ–OAR–2004–0505; FRL–9928–25–OAR]**

**RIN 2060–AS42**

### Completion of Requirement To Promulgate Emissions Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** In this action the Environmental Protection Agency (EPA) finalizes its proposed determination that

the EPA completed its statutory obligation under the Clean Air Act (CAA) to promulgate emissions standards for source categories accounting for not less than 90 percent of the aggregated emissions of each of seven specific hazardous air pollutants (HAP) enumerated in the CAA. On December 16, 2014, the EPA published the proposed determination that stated the basis for the agency's conclusion that it completed this obligation in February of 2011 by identifying the promulgated standards that collectively satisfy this obligation and provided the public an opportunity to comment on the EPA's determination. This action finalizes the EPA's determination.

**DATES:** This action is effective on June 3, 2015.

**ADDRESSES:** The EPA has established a docket for this rulemaking under Docket ID Number EPA–HQ–OAR–2004–0505. All documents in the docket are listed in the *http://www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *http:// www.regulations.gov* or in hard copy at the EPA Docket Center, EPA WJC West Building, Room 3334, 1301 Constitution Ave. NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For questions about this action, contact Mr. Nathan Topham, Office of Air Quality Planning and Standards; Sector Policies and Programs Division; Metals and Inorganic Chemicals Group (D243–02); Environmental Protection Agency; Research Triangle Park, NC 27111; telephone number: (919) 541–0483; fax number: (919) 541–3207; email address: *topham.nathan@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Organization of this document.* The information presented in this preamble is organized as follows:

I. General Information
  A. Where can I get a copy of this document?
  B. Judicial Review
II. Background Information
III. How has the EPA satisfied its obligation under CAA section 112(c)(6)?

  A. What are the emissions standards that the EPA has promulgated to meet the 90 percent requirement under CAA section 112(c)(6)?
  B. What are the surrogate pollutants used by the EPA when establishing CAA section 112(d)(2) standards for the source categories identified in the proposed determination?
IV. Summary of Significant Comments and Responses
  A. General/Legal Opposition to the EPA's Surrogacy Determinations
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act (CRA)

## I. General Information

### A. Where can I get a copy of this document?

In addition to being available in the docket, an electronic copy of this final action will also be available on the Internet through the EPA's Technology Transfer Network (TTN) Web site, a forum for information and technology exchange in various areas of air pollution control. Following signature by the EPA Administrator, the EPA will post a copy of this final action at: *http://www.epa.gov/ttn/atw/ eparules.html.* Following publication in the **Federal Register**, the EPA will post the **Federal Register** version of the rule at this same Web site.

### B. Judicial Review

Under CAA section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit by August 3, 2015. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements. Section

307(d)(7)(B) of the CAA further provides that "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review." This section also provides a mechanism for us to convene a proceeding for reconsideration, "[i]f the person raising an objection can demonstrate to the EPA that it was impracticable to raise such objection within [the period for public comment] or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule." Any person seeking to make such a demonstration to us should submit a Petition for Reconsideration to the Office of the Administrator, U.S. EPA, Room 3000, EPA WJC West Building, 1200 Pennsylvania Ave. NW., Washington, DC 20460, with a copy to both the person(s) listed in the preceding **FOR FURTHER INFORMATION CONTACT** section, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), U.S. EPA, 1200 Pennsylvania Ave. NW., Washington, DC 20460.

## II. Background Information

CAA section 112(c)(6) requires the EPA to take action with respect to the sources of seven specific persistent, bioaccumulative HAP. The section states, "With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each pollutant are subject to standards under subsection (d)(2) or (d)(4) of this section."

CAA section 112(c)(6) requires the EPA to ensure that source categories responsible for at least 90 percent of the aggregate emissions of each of the seven specified pollutants are subject to standards under CAA sections 112(d)(2) or 112(d)(4). It requires the EPA to list, by November 15, 1995, source categories assuring that sources responsible for 90 percent of the aggregate emissions are subject to emission standards pursuant to CAA section 112(d)(2) or (d)(4), and to promulgate such standards by November 15, 2000. Under CAA section 112(d)(2), the EPA imposes emission standards that require "the maximum

degree of reduction in emissions of the [HAP]" that the EPA concludes are achievable based on a consideration of factors identified in the statute. CAA section 112(d)(2). These standards are referred to as "maximum achievable control technology" or "MACT" standards. CAA section 112(d)(4) authorizes the EPA to set a health-based standard for a limited set of HAP for which a health threshold has been established, and that standard must provide for "an ample margin of safety." CAA section 112(d)(4).

On December 16, 2014, the EPA published in the **Federal Register** the proposed determination concluding that the requirements of CAA section 112(c)(6) were fulfilled in February of 2011. 79 FR 74656 (December 16, 2014).[1] The proposed determination provided a detailed summary of the litigation history regarding this action and provided an opportunity for comment on the EPA's proposed determination that it has fulfilled the requirements of CAA section 112(c)(6). The proposed rulemaking explained the basis for the agency's proposed determination by identifying the promulgated CAA section 112(d)(2) or 112(d)(4) standards that collectively satisfy the obligation and describing how the EPA determined which regulations would collectively satisfy the 90 percent requirement under CAA section 112(c)(6) using the updated 1990 baseline inventory of source categories that emit CAA section 112(c)(6) HAP, which was presented in Table 1 of the proposed determination. 79 FR at 74661–74671.

## III. How has the EPA satisfied its obligation under CAA section 112(c)(6)?

*A. What are the emissions standards that the EPA has promulgated to meet the 90 percent requirement under CAA section 112(c)(6)?*

This action finalizes the EPA's proposed determination that the Agency has promulgated emissions standards for source categories pursuant to CAA sections 112(d)(2) and (4) sufficient to satisfy the CAA section 112(c)(6) requirement that sources accounting for not less than 90 percent of the aggregate emissions of seven specific HAP are subject to standards under CAA sections 112(d)(2) or 112(d)(4).[2] Table 2 of the

December 2014 proposal provided a list of the emissions standards, including the name of each of the source categories, the name of the emissions standards that apply, and the rule citation for each (*i.e.*, CFR part and subpart). 79 FR 74674–74677, December 16, 2014. Table 3 of the 2014 proposal provided a list of the specific regulations (including CFR citations, part and subpart) that address 90 percent or more of each of the CAA section 112(c)(6) HAP. 79 FR at 74677. After considering and evaluating all public comments received in response to the proposed rule, we finalize our determination that the EPA has satisfied the CAA section 112(c)(6) requirement to establish CAA section 112(d)(2) or (4) standards for source categories that account for not less than 90 percent of the seven HAP listed in CAA section 112(c)(6).

*B. What are the surrogate pollutants used by the EPA when establishing CAA section 112(d)(2) standards for the source categories identified in the proposed determination?*

As noted in the proposed rule, the emissions standards that collectively satisfy the 90 percent requirement under CAA section 112(c)(6) were set by the EPA under two approaches: (1) Through standards that directly regulated CAA section 112(c)(6) HAP; and (2) through standards that set emission limits for another HAP or compound,[3] which serves as a surrogate for the CAA section 112(c)(6) HAP and other non-112(c)(6) HAP emitted from the source category.

The EPA noted in the proposed determination that, with respect to some of the CAA section 112(d)(2) standards that utilized the surrogacy approach, specifically those promulgated prior to the EPA's development of the baseline emissions inventory for CAA section 112(c)(6) and issuance of the 1998 listing notice, the EPA did not specifically indicate in those rulemaking records that the standards would be counted towards satisfying the 90 percent requirement in CAA section 112(c)(6). For these standards, the 2014 proposed determination explained how the surrogate standards control the CAA section 112(c)(6) HAP along with other HAP from the source categories and ensure that the sources of CAA section 112(c)(6) HAP emissions are "subject to

---

[1] The EPA's initial determination was signed on February 21, 2011, and published in the **Federal Register** on March 21, 2011.

[2] In addition to standards issued pursuant to section 112(d)(2) or (4), EPA also includes standards issued pursuant to section 129 as satisfying the 112(c)(6) requirement because section 129(a)(2) requires MACT standards that are virtually identical to the those standards required

pursuant to section 112(d)(2). In addition, section 129(h)(3)(A) states that "the performance standards under subsection (a) of this section and section [111] of this title applicable to a category of solid waste incineration units shall be deemed standards under section [112](d)(2) of this title."

[3] Some standards used non-HAP compounds (or groups of compounds) as surrogates for HAP.

standards'' for the purposes of CAA section 112(c)(6). The information presented in the proposed determination simply described the actions taken in these prior rulemakings and explained how the surrogate standards control the relevant CAA section 112(c)(6) HAP. The proposed determination did not reopen these prior actions. All those standards were subject to their own notice and comment rulemaking processes consistent with CAA sections 112 and 307(d), and, in several cases, to judicial review as provided by the strict statute of limitations imposed by CAA section 307(b)(1).

Table 1 of this preamble provides a list of the source categories listed under CAA section 112(c)(6), the names of the national standards that apply to those source categories, the **Federal Register** citations and CFR part and subparts for the rules, and the CAA section 112(c)(6) HAP regulated by those standards.

### TABLE 1—LIST OF SOURCE CATEGORIES, NATIONAL EMISSIONS STANDARDS, AND THE 112(c)(6) HAP SUBJECT TO THESE STANDARDS, TO FULFILL THE CAA SECTION 112(c)(6) OBLIGATIONS

| Section 112(c)(6) source category name | National emissions standard name(s) | CFR part and subpart | Final rule **Federal Register** citation | 112(c)(6) Pollutant |
|---|---|---|---|---|
| Aerospace Industry (Surface Coating). | National Emission Standards for Hazardous Air Pollutants for the Aerospace Industries. | 40 CFR part 63 subpart GG. | 60 FR 45948, September 1, 1995. | Mercury, POM. |
| Alkylated Lead Production. | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry. | 40 CFR part 63 subpart F. | 59 FR 19402, April 22, 1994. | Alkylated Lead. |
| | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater. | 40 CFR part 63 subpart G. | 59 FR 19402, April 22, 1994. | Alkylated Lead. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks. | 40 CFR part 63 subpart H. | 59 FR 19402, April 22, 1994. | Alkylated Lead. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Certain Processes Subject to the Negotiated Regulation for Equipment Leaks. | 40 CFR part 63 subpart I. | 59 FR 19402, April 22, 1994. | Alkylated Lead. |
| Asphalt Roofing Production. | National Emission Standards for Hazardous Air Pollutants for Asphalt Processing and Asphalt Roofing Manufacturing. | 40 CFR part 63 subpart LLLLL. | 68 FR 24562, May 7, 2003. | POM. |
| Blast Furnace and Steel Mills. | National Emission Standards for Hazardous Air Pollutants for Integrated Iron and Steel Manufacturing Facilities. | 40 CFR part 63 subpart FFFFF. | 68 FR 27645, May 20, 2003. | POM. |
| Chemical Manufacturing: Cyclic Crude and Intermediate Production. | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry. | 40 CFR part 63 subpart F. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater. | 40 CFR part 63 subpart G. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks. | 40 CFR part 63 subpart H. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Certain Processes Subject to the Negotiated Regulation for Equipment Leaks. | 40 CFR part 63 subpart I. | 59 FR 19402, April 22, 1994. | POM. |
| Chlorinated Solvents Production. | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry. | 40 CFR part 63 subpart F. | 59 FR 19402, April 22, 1994. | HCB. |
| | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater. | 40 CFR part 63 subpart G. | 59 FR 19402, April 22, 1994. | HCB. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks. | 40 CFR part 63 subpart H. | 59 FR 19402, April 22, 1994. | HCB. |

TABLE 1—LIST OF SOURCE CATEGORIES, NATIONAL EMISSIONS STANDARDS, AND THE 112(C)(6) HAP SUBJECT TO THESE STANDARDS, TO FULFILL THE CAA SECTION 112(C)(6) OBLIGATIONS—Continued

| Section 112(c)(6) source category name | National emissions standard name(s) | CFR part and subpart | Final rule **Federal Register** citation | 112(c)(6) Pollutant |
|---|---|---|---|---|
| | National Emission Standards for Organic Hazardous Air Pollutants for Certain Processes Subject to the Negotiated Regulation for Equipment Leaks. | 40 CFR part 63 subpart I. | 59 FR 19402, April 22, 1994. | HCB. |
| Coke Ovens: By-Product Recovery Plants. | National Emission Standard for Benzene Emissions from Coke By-Product Recovery Plants. | 40 CFR part 61 subpart L. | 54 FR 38073, September 14, 1989. | POM. |
| Coke Ovens: Charging, Topside & Door Leaks. | National Emission Standards for Hazardous Air Pollutants for Coke Oven Batteries. | 40 CFR part 63 subpart L. | 58 FR 57898, October 27, 1993. | POM. |
| | National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks. | 40 CFR part 63 subpart CCCCC. | 68 FR 18007, April 14, 2003. | POM. |
| Coke Ovens: Pushing, Quenching & Battery Stacks. | National Emission Standards for Hazardous Air Pollutants for Coke Oven Batteries. | 40 CFR part 63 subpart L. | 58 FR 57898, October 27, 1993. | POM. |
| | National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks. | 40 CFR part 63 subpart CCCCC. | 68 FR 18007, April 14, 2003. | POM. |
| Commercial Printing: Gravure. | National Emission Standards for Hazardous Air Pollutants: Printing and Publishing Industry. | 40 CFR part 63 subpart KK. | 61 FR 27132, May 30, 1996. | POM. |
| Electric Arc Furnaces (EAF)—Secondary Steel. | National Emission Standards for Hazardous Air Pollutants for Area Sources: Electric Arc Furnace Steelmaking Facilities. | 40 CFR part 63 subpart YYYYY. | 72 FR 74088, December 28, 2007. | Mercury. |
| Fabricated Metal Products. | National Emission Standards for Hazardous Air Pollutants: Surface Coating of Miscellaneous Metal Parts and Products. | 40 CFR part 63 subpart MMMM. | 69 FR 129, January 2, 2004. | POM. |
| Gasoline Distribution (Stage 1). | National Emission Standards for Hazardous Air Pollutants for Gasoline Distribution Facilities (Bulk Gasoline Terminals and Pipeline Breakout Stations). | 40 CFR part 63 subpart R. | 59 FR 64303, December 14, 1994. | POM. |
| Gold Mines ............... | National Emission Standards for Hazardous Air Pollutants: Gold Mine Ore Processing and Production Area Source Category. | 40 CFR part 63 subpart EEEEEEE. | 76 FR 9450, February 17, 2011. | Mercury. |
| Hazardous Waste Incineration. | National Emission Standards for Hazardous Air Pollutants from Hazardous Waste Combustors. | 40 CFR part 63 subpart EEE. | 64 FR 52827, September 30, 1999; 70 FR 59402, October 12, 2005. | POM, Mercury, PCB, Dioxins, Furans. |
| Industrial Organic Chemicals Manufacturing. | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry. | 40 CFR part 63 subpart F. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater. | 40 CFR part 63 subpart G. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks. | 40 CFR part 63 subpart H. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Certain Processes Subject to the Negotiated Regulation for Equipment Leaks. | 40 CFR part 63 subpart I. | 59 FR 19402, April 22, 1994. | POM. |
| Industrial Stationary IC Engines—Diesel. | National Emission Standards for Hazardous Air Pollutants for Stationary Reciprocating Internal Combustion Engines. | 40 CFR part 63 subpart ZZZZ. | 69 FR 33473, June 15, 2004. | POM. |
| Industrial Stationary IC Engines—Natural Gas. | National Emission Standards for Hazardous Air Pollutants for Stationary Reciprocating Internal Combustion Engines. | 40 CFR part 63 subpart ZZZZ. | 69 FR 33473, June 15, 2004. | POM. |

TABLE 1—LIST OF SOURCE CATEGORIES, NATIONAL EMISSIONS STANDARDS, AND THE 112(C)(6) HAP SUBJECT TO THESE STANDARDS, TO FULFILL THE CAA SECTION 112(c)(6) OBLIGATIONS—Continued

| Section 112(c)(6) source category name | National emissions standard name(s) | CFR part and subpart | Final rule **Federal Register** citation | 112(c)(6) Pollutant |
|---|---|---|---|---|
| Industrial/Commercial/Institutional Boilers. | National Emission Standards for Hazardous Air Pollutants for Industrial/Commercial/Institutional Boilers and Process Heaters. | 40 CFR part 63 subpart DDDDD. | 76 FR 15608, March 21, 2011. | POM, Mercury, Dioxins, Furans. |
| | National Emission Standards for Hazardous Air Pollutants for Area Sources: Industrial, Commercial, and Institutional Boilers. | 40 CFR part 63 subpart JJJJJJ. | 76 FR 15554, March 21, 2011. | POM, Mercury, Dioxins, Furans. |
| Lightweight Aggregate Kilns. | National Emission Standards for Hazardous Air Pollutants from Hazardous Waste Combustors. | 40 CFR part 63 subpart EEE. | 64 FR 52827, September 30, 1999; 70 FR 59402, October 12, 2005. | Mercury, Dioxins, Furans. |
| Medical Waste Incineration. | Standards of Performance and Emissions Guidelines for Hospitals/Medical/Infectious Waste Incinerators. | 40 CFR part 60 subpart Ce, Ec; & 40 CFR part 62 subpart HHH. | 74 FR 51367, October 6, 2009. | POM, Mercury, PCB, Dioxins, Furans. |
| Mercury Cell Chlor Alkali Production. | National Emission Standards for Hazardous Air Pollutants: Mercury Emissions from Mercury Cell Chlor Alkali Plants. | 40 CFR part 63 subpart IIIII. | 68 FR 70903, December 19, 2003. | Mercury. |
| Municipal Waste Combustion. | Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Large Municipal Waste Combustion Units. | 40 CFR part 60 subpart Cb, Ea, Eb; & 40 CFR part 62 subpart FFF. | 71 FR 27324, May 10, 2006. | POM, Mercury, PCB, Dioxins, Furans. |
| | Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Stationary Sources: Small Municipal Waste Combustion Units. | 40 CFR part 60 subpart AAAA, BBBB & 40 CFR part 62 subpart JJJ. | 65 FR 76349, December 6, 2000; 65 FR 76337, December 6, 2000. | POM, Mercury, PCB, Dioxins, Furans. |
| Naphthalene Production. | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry. | 40 CFR part 63 subpart F. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater. | 40 CFR part 63 subpart G. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks. | 40 CFR part 63 subpart H. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Certain Processes Subject to the Negotiated Regulation for Equipment Leaks. | 40 CFR part 63 subpart I. | 59 FR 19402, April 22, 1994. | POM. |
| Paints and Allied Products (Major). | National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing. | 40 CFR part 63 subpart FFFF. | 68 FR 63851, November 10, 2003. | POM. |
| Paper Coated and Laminated, Packaging. | National Emission Standards for Hazardous Air Pollutants: Paper and Other Web Coating. | 40 CFR part 63 subpart JJJJ. | 67 FR 72329, December 4, 2002. | POM. |
| Pesticides Manufacture & Agricultural Chemicals. | National Emission Standards for Hazardous Air Pollutants: Pesticide Active Ingredient Production. | 40 CFR part 63 subpart MMM. | 64 FR 33549, June 23, 1999. | HCB. |
| | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry. | 40 CFR part 63 subpart F. | 59 FR 19402, April 22, 1994. | HCB. |
| | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater. | 40 CFR part 63 subpart G. | 59 FR 19402, April 22, 1994. | HCB. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks. | 40 CFR part 63 subpart H. | 59 FR 19402, April 22, 1994. | HCB. |

TABLE 1—LIST OF SOURCE CATEGORIES, NATIONAL EMISSIONS STANDARDS, AND THE 112(C)(6) HAP SUBJECT TO THESE STANDARDS, TO FULFILL THE CAA SECTION 112(c)(6) OBLIGATIONS—Continued

| Section 112(c)(6) source category name | National emissions standard name(s) | CFR part and subpart | Final rule **Federal Register** citation | 112(c)(6) Pollutant |
|---|---|---|---|---|
| Petroleum Refining: All Processes. | National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries. | 40 CFR part 63 subpart CC. | 60 FR 43244, August 18, 1995. | POM. |
| | National Emission Standards for Hazardous Air Pollutants for Petroleum Refineries: Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units. | 40 CFR part 63 subpart UUU. | 67 FR 17761, April 11, 2002. | POM. |
| Phthalic Anhydride Production. | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry. | 40 CFR part 63 subpart F. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater. | 40 CFR part 63 subpart G. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks. | 40 CFR part 63 subpart H. | 59 FR 19402, April 22, 1994. | POM. |
| | National Emission Standards for Organic Hazardous Air Pollutants for Certain Processes Subject to the Negotiated Regulation for Equipment Leaks. | 40 CFR part 63 subpart I. | 59 FR 19402, April 22, 1994. | POM. |
| Plastics Material and Resins Manufacturing. | National Emission Standards for Hazardous Air Pollutants for Group IV Polymers and Resins. | 40 CFR part 63 subpart JJJ. | 61 FR 48208, September 12, 1996. | POM. |
| Portland Cement Manufacture: Hazardous Waste Kilns. | National Emission Standards for Hazardous Air Pollutants from Hazardous Waste Combustors. | 40 CFR part 63 subpart EEE. | 64 FR 52827, September 30, 1999; 70 FR 59402, October 12, 2005. | POM, Mercury, Dioxins, Furans. |
| Portland Cement Manufacture: Non-Hazardous Waste Kilns. | National Emission Standards for Hazardous Air Pollutants for the Portland Cement Manufacturing Industry. | 40 CFR part 63 subpart LLL. | 75 FR 54970, September 9, 2010. | POM, Mercury, Dioxins, Furans. |
| Primary Aluminum Production. | National Emission Standards for Hazardous Air Pollutants for Primary Aluminum Reduction Plants. | 40 CFR part 63 subpart LL. | 62 FR 52384, October 7, 1997. | POM, Mercury, Dioxins, Furans. |
| Pulp and Paper— Kraft Recovery Furnaces. | National Emission Standards for Hazardous Air Pollutants for Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills. | 40 CFR part 63 subpart MM. | 63 FR 18504, April 15, 1998; 66 FR 3180, January 12, 2001. | POM, Mercury. |
| Pulp and Paper— Lime Kilns. | National Emission Standards for Hazardous Air Pollutants for Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills. | 40 CFR part 63 subpart MM. | 63 FR 18504, April 15, 1998; 66 FR 3180, January 12, 2001. | POM, Mercury. |
| Secondary Aluminum Smelting. | National Emission Standards for Hazardous Air Pollutants for Secondary Aluminum Production. | 40 CFR part 63 subpart RRR. | 65 FR 15689, March 23, 2000. | Dioxins, Furans. |
| Secondary Lead Smelting. | National Emission Standards for Hazardous Air Pollutants for Secondary Lead Smelting. | 40 CFR part 63 subpart X. | 60 FR 32587, June 23, 1995; 77 FR 555, January 5, 2012. | POM, Dioxins, Furans. |
| Sewage Sludge Incineration. | Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Sewage Sludge Incineration Units. | 40 CFR part 60 subparts LLLL, MMMM. | 76 FR 15372, March 21, 2011. | Mercury. |
| Ship Building and Repair (Surface Coating). | National Emission Standards for Hazardous Air Pollutants for Shipbuilding and Ship Repair (Surface Coating). | 40 CFR part 63 subpart II. | 60 FR 64330, December 15, 1995. | POM. |
| Transportation Equipment Manufacturing (SICs Combined). | National Emission Standards for Hazardous Air Pollutants: Surface Coating of Plastic Parts and Products. | 40 CFR part 63 subpart PPPP. | 69 FR 20967, April 19, 2004; 69 FR 22601, April 26, 2004. | POM. |

TABLE 1—LIST OF SOURCE CATEGORIES, NATIONAL EMISSIONS STANDARDS, AND THE 112(C)(6) HAP SUBJECT TO THESE STANDARDS, TO FULFILL THE CAA SECTION 112(C)(6) OBLIGATIONS—Continued

| Section 112(c)(6) source category name | National emissions standard name(s) | CFR part and subpart | Final rule **Federal Register** citation | 112(c)(6) Pollutant |
|---|---|---|---|---|
| Wood Household Furniture Manufacturing. | National Emission Standards for Hazardous Air Pollutants from Wood Furniture Manufacturing Operations. | 40 CFR part 63 subpart JJ. | 60 FR 62930, December 7, 1995. | POM. |

## IV. Summary of Significant Comments and Responses

During the public comment period for the proposed determination, we received comments from three organizations: the Council of Industrial Boiler Owners (CIBO), the Coalition for Clean Air Implementation (CCAI), and Sierra Club. The CIBO and CCAI submitted comments supporting our proposed determination that we have fulfilled the CAA section 112(c)(6) obligations and agreed with our use of surrogate pollutants. Sierra Club submitted comments claiming that a number of previously promulgated standards identified in the proposed determination are unlawful for purposes of CAA section 112(d)(2) such that those standards may not count toward satisfying the 90 percent requirement in CAA section 112(c)(6). A summary of significant public comments received during the comment period and the EPA's response to those comments are provided below in this section of this preamble. All the remaining public comments received during the comment period and the EPA's responses to those comments are presented in the *Summary of Public Comments and EPA's Responses for the Completion of Requirements to Promulgate Standards Under CAA Section 112(c)(6) 2015 Final Rule* document, which is available in the docket for this action.

### A. General/Legal Opposition to the EPA's Surrogacy Determinations

*Comment:* One commenter states that "for source categories listed under section [112](c)(6), the EPA must set a MACT standard (*i.e.,* a standard under section [112](d)(2)–(3)) for each section 112(c)(6) pollutant for which the source was listed." [4] See *Desert Citizens Against Pollution* v. *EPA,* 699 F.3d 524, 527–528 (D.C. Cir. 2012).[5] Thus, the

commenter states, "to satisfy section 112(d)(2), the EPA must determine the maximum achievable degree of reduction for each hazardous air pollutant that a source category emits." The commenter states that the CAA also specifies a "floor" for the reduction that the EPA must require for each pollutant. Therefore, the commenter believes that the EPA's claim that it can meet its obligations under section 112(c)(6) by setting a single limit on the aggregate emissions of all HAP from an industrial source category is contrary to the language in CAA and violates the text of sections 112(c)(6) and 112(d), reflecting an unreasonable statutory interpretation.

The commenter states that although the EPA may set surrogate standards for HAP where it is reasonable to do so, see *National Lime,* 233 F.3d at 637, setting surrogate standards instead of direct standards for HAP does not, according to the commenter, excuse the EPA from its clear statutory obligation to assure that each HAP emitted by a source category is reduced to the extent that sections 112(d)(2)–(3) requires. The commenter maintains that the United States Court of Appeals for the District of Columbia Circuit has made clear, a surrogate is reasonable only if it allows the EPA to identify "the best achieving sources, and what they can achieve" with respect to the target HAP. *Sierra Club* v. *EPA,* 353 F.3d 976, 985 (D.C. Cir. 2004).

As an example of a reasonable surrogate, the commenter asserts that particulate matter (PM) is a reasonable surrogate for metallic HAP only where the EPA demonstrates that (1) the metallic HAP are "invariably present" in the surrogate pollutant such that there is a strong correlation between the two; (2) the control technology used for PM control "indiscriminately captures" the metallic HAP along with the PM; and (3) the means by which sources achieve reductions in PM are the only means by which they achieve reductions" in metallic HAP emissions.

*National Lime,* 233 F.3d at 639; *Sierra Club,* 353 F.3d at 984. The commenter maintains that the United States Court of Appeals for the District of Columbia Circuit has held repeatedly that what sources "achieve" with respect to a given HAP is not limited to what they achieve intentionally, but also includes lower emission levels achieved through the use of cleaner fuels or raw materials regardless of whether such use reflects any deliberate intent to reduce emissions. *Sierra Club* v. *EPA,* 479 F.3d 875, 883 (D.C. Cir.2007) (citing *National Lime,* 233 F.3d at 640).

The commenter states that the EPA's use of "total HAP," "total organic HAP," and other such aggregate measures as "surrogates" for pollutants that fit into those categories is a definition maneuver and not a technical determination. The commenter states that this approach to surrogacy is unlawful because it conflicts with EPA's statutory obligation under sections 112(c)(6) and 112(d), and also the commenter asserts with the EPA's own interpretation of those provisions, see *Desert Citizens,* 699 F.3d at 527–28, which is that the EPA must set MACT standards for each of the section 112(c)(6) pollutants for which each source category was listed. The commenter states there is nothing left of this obligation if the EPA can simply define a category of pollutants (such as total HAP) broad enough to include all the pollutants it must regulate and then set an aggregate limit for the category.

Additionally, the commenter states that saying that POM is a constituent of total HAP, for example, is just a different way of saying it is a HAP— something that Congress already clearly indicated by listing POM as a HAP in section 112(b). The commenter believes that such statements do nothing to demonstrate that emissions of total HAP identify the best performing sources with respect to POM and what sources can achieve with respect to POM. The commenter believes that if the EPA had authority to create surrogates by simply defining a group of pollutants to include all the pollutants it must regulate, it would abrogate the limits that decisions of the United States Court of Appeals for

---

[4] The commenter notes that section 112(c)(6) also allows the EPA to set standards for these pollutants under section 112(d)(4) if a health threshold has been established for that pollutant. CAA sections 112(c)(6) and (d)(4). This provision is not at issue because the EPA has not established health thresholds for any of the section 112(c)(6) pollutants at issue here.

[5] Accepting as "reasonable" the EPA's interpretation of section 112 as requiring it to set

section 112(d)(2) standards for the section 112(c)(6) pollutants when it regulates a category of area sources listed pursuant to section 112(c)(6).

the District of Columbia Circuit have formulated to ensure that the EPA's use of surrogates is reasonable. The commenter states that there would be nothing left, for example, of the requirement that the HAP to be regulated be "invariably present" in the surrogate pollutant, *National Lime*, 233 F.3d at 639, if the EPA could simply define the surrogate "pollutant" as a group of pollutants that includes the regulated pollutant.

The commenter argues that section 112(c)(6) is a provision that specifically addresses seven persistent bioaccumulative toxics that Congress recognized were particularly harmful. The commenter believes that for sources the EPA lists as contributing to 90 percent of the total emissions of one or more of these pollutants, the EPA must set a standard for that pollutant ensuring the maximum emissions reduction. The commenter states that Congress would not have singled out these seven pollutants if it intended for the EPA only to set a single limit for the aggregate of emissions of all the different HAP.

The commenter states that even if it were permissible in general for the EPA to evade its standard-setting obligations by defining the surrogate "pollutant" as a group of pollutants, the EPA's surrogacy claims in this rule are unlawful and arbitrary because they lack supporting data or analysis. The commenter argues that the EPA's surrogacy explanations in the proposed determination are standards under section 307(d) because they are first-time claims that the relevant pollutants are subject to standards. The EPA must according to the commenter comply with the requirements of section 307(d) governing CAA rulemakings for all of those previously issued standards. The commenter maintains the EPA has not complied with these requirements because according to the commenter the EPA has not provided documentation, data, or analysis in support of its proposed determination. For this reason, the commenter concludes that the EPA has violated section 307(d) by failing to explain the "methodology used in obtaining the data and in analyzing the data" in the proposed determination, by failing to provide opportunity for informed public participation and input, and by unlawfully basing the Agency's conclusions on information or data which has not been made available to the public through the docket. The commenter also believes that the EPA has acted arbitrarily and capriciously by failing to provide substantial record evidence in support of its proposed

section 112(c)(6) determination, by failing to consider relevant factors, and by failing to provide a rational connection between the facts found and the conclusion made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43. The commenter gives examples of specific surrogacy claims for specific source categories and processes that it believes are unlawful and arbitrary. We address the specific claims in the *Summary of Public Comments and EPA's Responses for the Completion of Requirements to Promulgate Standards Under CAA Section 112(c)(6) 2015 Final Rule* document, which is available in the docket for this action.

*Response:* The commenter misinterprets the CAA, mischaracterizes the EPA's proposed determination, and provides comments challenging the substance of a number of previously issued EPA rules. As explained below, the comments challenging the legitimacy of the standards on which EPA relies to demonstrate it has satisfied its obligations under CAA section 112(c)(6) are far outside the scope of the proposed CAA section 112(c)(6) determination at issue. The EPA, therefore, has no obligation to respond to those comments.

The proposed determination memorializes and provides notice that the EPA has fulfilled, via numerous other previous regulatory actions, its duties under section 112(c)(6) of the CAA. The proposal lists CAA section 112(d)(2) or 112(d)(4) standards previously promulgated by the EPA and proposed the conclusion that the listed standards cover sources that, in the aggregate, emit 90 percent or more of the pollutants specifically identified in CAA section 112(c)(6). The commenter does not challenge that conclusion. In fact, no commenter suggests that the source categories listed did not emit, in the aggregate prior to regulation, 90 percent or more of the specified pollutants or that the source categories are not subject to the CAA section 112(d)(2) standards identified. Instead, the commenter seeks to use the proposed determination to reopen standards that were finalized by the EPA in some cases more than 20 years ago. The commenter argues that the EPA must now demonstrate, for each previously promulgated rule, that each standard reduces HAP "to the extent that [112] (d)(2)–(3) requires," that in each rulemaking the EPA properly identified "the best performing sources," and that the EPA must provide documentation, data and analysis to support the validity of the standards in the previously promulgated

rules. CAA section 112(c)(6) imposes no such obligation on the EPA. As explained below, the commenter aims to collaterally attack prior EPA actions. All comments that raise such collateral attacks are outside the scope of the proposed CAA section 112(c)(6) determination. All of the rules relied upon by the EPA in this determination were promulgated through notice and comment rulemaking consistent with CAA section 307(d), and were final agency actions subject to judicial review. CAA section 112(c)(6) does not provide commenters another opportunity to belatedly challenge these prior EPA actions, nor does it mandate that the EPA re-promulgate or otherwise re-open for purposes of section 112(c)(6) standards that were previously promulgated under section 112(d)(2).

As an initial matter, it is important to understand the specific duties that CAA section 112(c)(6) imposes on the EPA, especially since the commenter consistently paraphrases the statutory language to assert there are duties beyond which the CAA requires by its terms. CAA section 112(c)(6) requires the EPA, with respect to seven specified HAP—alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin—to "list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4) of this section." The provision requires the listing to be done by November 15, 1995, and requires that sources accounting for not less than 90 percent of aggregate emissions of each of the enumerated pollutants be subject to CAA section 112(d)(2) or (4) standards by November 15, 2000. CAA section 112(c)(6) does not require the EPA to submit a report stating that the agency has subjected those sources to such standards, or establish a deadline for any such report. *Sierra Club* v. *EPA*, 699 F.3d 530, 536 (D.C. Cir. 2012) (Henderson Concurring)("EPA is under no obligation, statutory or otherwise, to inform anyone that it has satisfied the requirements of section 112(c)(6)."). Moreover, while CAA section 112(c)(6) gives the EPA authority to list source categories, the rules which establish standards for those source categories are promulgated pursuant to separate CAA provisions.

The CAA section 112(d)(2) standards (also referred to as maximum achievable control technology or MACT standards), which commenter seeks to collaterally

attack, regulate HAP emitted from major sources and in some instances area sources and were promulgated in accordance with the following CAA provisions. CAA section 112(c)(1) requires the EPA to list all major sources and authorizes the EPA to list area sources, and section 112(d)(1) requires the EPA to regulate all HAP from major sources pursuant to CAA section 112(d)(2) or (d)(4). CAA section 112(e)(1)(A)–(E) imposes sequential milestones for the EPA to complete issuance of MACT standards, and requires that the final set of such standards be promulgated by November 15, 2000, the same date by which under CAA section 112(c)(6) sources accounting for 90 percent of the enumerated HAP were required to have become subject to CAA section 112(d)(2) or (d) standards. Therefore, for major sources, CAA section 112(c)(6) is redundant with respect to the HAP to be regulated, the type of standards required, and the ultimate timing for completion of issuing such standards. The HAP specifically listed in CAA section 112(c)(6) are also on the CAA section 112(b)(1) list of HAP and, thus, the CAA section 112(d)(1) obligation to set CAA section 112(d)(2) or (d)(4) standards for all HAP from major sources applies equally to the CAA section 112(c)(6) HAP. CAA section 112(c)(6) adds nothing substantive to this requirement. Even the CAA section 112(e)(1) deadlines for promulgating such standards is ultimately identical to the deadline in CAA section 112(c)(6).[6] As such, it is irrelevant whether the EPA mentioned CAA section 112(c)(6) during the rulemaking for any standard for a major source category, including standards where the Agency regulated the area sources in the category at the same time and in the same manner as

the major sources (*i.e.* pursuant to CAA section 112(d)(2)).[7]

For all the rules that the commenter seeks to collaterally attack, the public was on notice during each specific rulemaking that the EPA was setting MACT standards for the HAP, including the CAA section 112(c)(6) HAP, emitted by the source category. Parties, including the commenter, could have challenged the adequacy of those standards at the time they were issued if they believed the standards did not sufficiently reduce the HAP emitted by the source category, in whatever manner those standards took with respect to regulating each HAP individually or collectively through a surrogate. See *National Lime Association* v. *EPA,* 33 F.3d 625, 633–34 (D.C. Cir. 2000) (finding that CAA section 112(d)(1) requires the EPA to establish standards for all HAP emitted from major sources). Any challenges to the legitimacy of the standards, including challenges suggesting that certain HAP were not adequately regulated, should have been raised during the rulemaking for the standards. If any issue remained when the standards were finalized, the proper recourse would have been to petition for judicial review pursuant to CAA section 307(b). That provision provides that "[a] petition for review of action of the [EPA] Administrator in promulgating . . . any emission standard or requirement under section 112 of this title . . . shall be filed within sixty days from the date notice of such promulgation. . . . appears in the **Federal Register**. . . ." CAA section 307(b)(1). Once the 60-day period has lapsed, a party may not raise arguments that "were available to them at the time the rule was adopted." *Nat'l Mining Ass'n* v. *DOI,* 70 F.3d 1345, 1350 (D.C. Cir. 1995).

For the reasons stated above, because the commenter challenges the sufficiency of the underlying standards as they apply to certain CAA section 112(c)(6) HAP, the commenter should have raised these issues in timely, direct challenges to those rules. CAA section 112(c)(6) does not allow for challenges to the legitimacy of CAA section 112(d) standards adopted in prior rulemakings outside the 60-day window for challenging those standards established in CAA section 307(b)(1). Moreover, in the proposed determination, EPA did not re-opened those previously promulgated standards, either to review

their adequacy for controlling any emitted HAP (including section 112(c)(6) HAP) under section 112(d)(2), or for any other purpose. Therefore, this final determination itself cannot provide a new opportunity to challenge those previously promulgated rules under either section 112(d)(2) or section 112(c)(6).

In addition to raising belated comments, the commenter argues that CAA section 112(c)(6) requires the EPA to set a "specific limit" for each of the CAA section 112(c)(6) HAP. It is not clear what the commenter means by a "specific limit." The commenter may be arguing that the EPA cannot rely on CAA section 112(d)(2) or (d)(4) standards that use surrogates to demonstrate that it has satisfied its obligation under CAA section 112(c)(6). However, it appears that the commenter is arguing that CAA section 112(c)(6) somehow limits the EPA's discretion to use particular types of surrogates when setting MACT standards. The commenter specifically objects to the EPA's standard for total HAP or total hazardous organic pollutants. There is no statutory support for either argument. Indeed, as other sections of the CAA illustrate, Congress knew how to require pollutant-specific standards. For example, CAA section 129(a)(4) explicitly requires the EPA to set numeric standards "for the [enumerated] substances or mixtures" listed in that subsection. That provision expressly requires the EPA to set numerical emissions limitations "for" a list of nine substances emitted by solid waste incineration units, and expressly authorizes the regulation of other pollutants through, among other things, surrogate standards. Unlike CAA section 129(a)(4), the terms of CAA section 112(c)(6) do not direct the EPA to set such standards "for" the CAA section 112(c)(6) HAP. Congress conspicuously did not take this approach in CAA section 112(c)(6), and, thus, left intact the EPA's discretion to establish surrogate standards.

CAA section 112(c)(6) requires the Agency to assure that "sources accounting for" at least 90 percent of the emissions of the listed HAP are "subject to standards" under CAA sections 112(d)(2) or (d)(4), without specifying the form of those standards, or how those standards must operate or be applied to those sources. The provision does not expressly state that the EPA can meet CAA section 112(c)(6) only by setting specific standards "for" the listed HAP, unlike CAA section 129(a)(4). As the commenter notes, the United States Court of Appeals for the District of Columbia Circuit upheld the

---

[6] The primary impacts of CAA section 112(c)(6) are to require the EPA to list area sources if major sources do not account for at least 90 percent of each of the seven HAP, and to limit the EPA's discretion to set so-called generally available control technology or GACT standards for area sources. Most relevant here is the limitation on the EPA's authority to establish GACT standards. CAA section 112(d)(5) provides that, for listed area sources, the EPA may set emission standards that "provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants." CAA section 112(c)(6) removes the EPA's discretion to establish GACT standards for the seven section 112(c)(6) HAP emitted if an area source category must be regulated pursuant to CAA section 112(d)(2) or (4) to ensure that sources accounting for not less than 90 percent of the seven HAP are subject to CAA section 112 (d)(2) or (d)(4) standards. As shown in this notice, none of the standards applicable to area sources that the EPA listed and relied on to demonstrate that it has met its obligations under CAA section 112(c)(6) were established pursuant to CAA section 112(d)(5).

[7] Several of the rulemakings that the commenter collaterally attacks regulated major and area sources together and the Agency established the same section CAA section 112(d)(2) standard for both the major and the area sources in the categories. The commenter makes no distinction between major and area sources in its comments.

EPA's approach of satisfying its general obligation under CAA section 112 to set standards through surrogates, as long as the choice of the surrogate is itself reasonable. *National Lime Ass'n* v. *EPA,* 233 F.3d 625, 634, 637 (D.C. Cir. 2000); see also, *e.g., Sierra Club* v. *EPA,* 353 F.3d 976, 982–85 (D.C. Cir. 2004). In fact, in the *National Lime* decision, instead of mandating that the EPA set a specific standard for each metallic HAP, the Court held that the EPA's standards for PM as a surrogate for regulating the aggregate metallic HAP was reasonable. 233 F.3d at 639.

Moreover, CAA section 112(c)(6) contains a numeric benchmark only as to source categories responsible for the percentage of aggregate baseline emissions that must be controlled, not the amount of emissions of each enumerated HAP that must be reduced. As this Court explained in *National Lime,* where "EPA is under no obligation to achieve a particular numerical reduction in HAP . . . emissions," but rather only to apply MACT based on the HAP reductions "achieved" by certain facilities, "then the EPA may require . . . control [of a surrogate] without quantifying the reduction in [the target] HAP . . . thus achieved." 233 F.3d at 639. The same rationale applies here, where the EPA's only obligation under CAA section 112(c)(6) is to apply the same MACT standard considered in *National Lime* to particular sources accounting for 90 percent of emissions of the CAA section 112(c)(6) HAP. The EPA has set standards pursuant to CAA sections 112(d)(2) or (d)(4) regulating emissions of substances identified as surrogates for the CAA section 112(c)(6) HAP, and those standards reduce the CAA section 112(c)(6) HAP; thus, the EPA has fully met its obligation to set standards assuring that source categories accounting for not less than 90 percent of the aggregate emissions of the CAA section 112(c)(6) pollutants at issue are subject to section 112(d)(2) or (4) standards.

The commenter also contends that the present determination constitutes a separate CAA 307(d) rulemaking with regard to some of the previously and elsewhere promulgated surrogate standards that the EPA credits towards satisfying the requirement in CAA section 112(c)(6) that source categories accounting for 90 percent of the aggregate enumerated HAP be subjected to CAA section 112(d)(2) or (4) standards. The commenter argues that the EPA must demonstrate anew the validity of the prior separate rulemaking actions and provide data and documentation to support specific aspects of those rules to satisfy the general rulemaking requirements of CAA section 307(d) and the requirements of CAA section 112. There is no statutory basis for this argument, which is an attempt to use this non-statutorily required determination that the EPA has satisfied its CAA section 112(c)(6) obligation to reopen numerous rules, many of which were finalized over a decade ago, as a means to force a non-required re-opening of such standards. Moreover, the commenter's assertion that the proposed CAA section 112(c)(6) determination was the first time the EPA provided notice of its claim that the surrogate standards were being credited for controlling the CAA section 112(c)(6) HAP is inaccurate, assuming it is even relevant (nothing in section 112(c)(6), after all, requires EPA to "provide notice," either sequentially or ultimately, that the Agency has finally discharged its duty to set section 112(d)(2) standards for the subject source categories accounting for 90 percent of the aggregate section 112(c)(6) HAP. In any event, contrary to the commenter's assertion, the EPA provided such notice of its expectations to discharge its section 112(c)(6) responsibilities when the Agency published the 1998 listing notice identifying the source categories that, based on the 1990 emissions inventory, are responsible for 90 percent of the aggregate emissions of each of the seven pollutants identified in section 112(c)(6) from stationary, anthropogenic sources (*i.e.,* sources within the scope of CAA sections 112 and/or 129).[8] 63 FR 17838 (April 10, 1998) ("1998 listing notice"). Included on the list were the MACT standards for the source categories at issue in this comment, and most of the specific standards in the comments were promulgated prior to the 1998 listing. The commenter's argument that the proposed determination constitutes the first time notice was given is without merit for any source category listed in the 1998 notice, particularly for those source categories that were regulated after that listing was published in the **Federal Register**. The argument is also without merit for the standards issued prior to the 1998 notice. While the EPA might not have identified at the time some of these standards were issued that the EPA would count the standards towards meeting the 90 percent requirement in CAA section 112(c)(6), such intent was made public in the 1998 notice. Further, as discussed above, the public was on notice at the time the EPA established these MACT standards that the standards would regulate the HAP, including the CAA section 112(c)(6) HAP, emitted from the source categories. If the commenter believed that the prior actions did not sufficiently control the HAP, including the CAA section 112(c)(6) HAP, from those source categories, the commenter had a responsibility to make those assertions at the time the Agency established the CAA section 112(d) standards. This applied equally to the comments questioning the surrogate standards. The commenter should have raised its concerns with the surrogate standards for "total HAP" or "total organic HAP" at the time the standards were issued if it believed such surrogates are not reasonable or in compliance with the CAA. In any event, the commenter's claim that the proposed determination was the first time notice is refuted by the administrative petitions the commenter filed in 1999, subsequent to the 1998 notice, requesting the EPA to revise some of the standards included in the 1998 notice and addressed in the comments on the proposed CAA section 112(c)(6) determination at issue. In a letter dated January 19, 2001, the EPA denied the petitions, explaining how each of these standards meet the CAA section 112(c)(6) requirement in addressing the HAP enumerated in that section.[9]

Section 112(c)(6) does not require that the EPA take an additional, separate final regulatory action to re-open any previously promulgated standards, and the EPA in fact did not reopen these prior actions in the proposed CAA section 112(c)(6) determination. Therefore, the proposed notice does not support a belated, backdoor attack on rules that were in some cases issued more than 20 years ago. The proposed CAA section 112(c)(6) determination is a simple, discretionary accounting of the EPA's previous regulatory efforts, explaining in mathematical terms that the EPA has previously listed sources

---

[8] The EPA has updated the 1998 listing several times to remove source categories no longer needed to meet the CAA section 112(c)(6) requirement based on updated information, and to add source categories subsequently determined to be necessary to reach the 90 percent threshold. See, *e.g.,* 76 FR 9450 (February 17, 2011) (adding Gold Mine source category); 73 FR 1916 (January 10, 2008) (finalizing decision not to regulate gasoline distribution area sources under CAA section 112(c)(6)); 72 FR 53814 (September 20, 2007) (adding Electric Arc Furnace Steelmaking Facility area source category); 67 FR 68124 (November 8, 2002) (removing several source categories).

[9] Letter from Browner to Pew, Response to Sierra Club Petition to Revise Regulations for the SOCMI Category, Coke Oven Batteries, Petroleum Refineries, Medical Waste Incinerators, and Municipal Waste Combustors (dated January 25, 1999)(January 19, 2001).

and promulgated HAP standards sufficient to satisfy the requirement that sources needed for meeting the 90 percent requirement for each of the CAA section 112(c)(6) HAP have, in fact, become subject to standards under CAA sections 112(d)(2) or (4). While the proposed determination in some instances clarifies the surrogacy relationship between the established standards and the relevant CAA section 112(c)(6) HAP, the proposal does not discuss or attest to the substance of the standards previously promulgated for each listed category and subcategory because those standards have been subject to their own notice and comment rulemaking processes, and, in several cases, to judicial review as provided by the strict statute of limitations imposed by CAA section 307(b)(1). The proposed determination only provides the mathematical and technical basis for the EPA's calculation that the sources in the categories and subcategories for which it has separately promulgated emission standards account for 90 percent of the baseline emissions of the CAA section 112(c)(6) HAP.

The United States Court of Appeals for the District of Columbia Circuit specified in *Oljato Chapter of Navajo Tribe* v. *Train,* 515 F.2d 654, 666 (D.C. Cir. 1975), a procedure for pursuing claims that new information merits revision of a previous agency regulation: The prospective petitioner must first bring the new information to the Agency's attention in an administrative petition seeking revision of the prior regulation. CAA Section 553(d) of the Administrative Procedure Act (APA) also explicitly allows parties to petition the Agency to amend a rule. A party that identifies new information that it believes undermines the legitimacy of an existing standard may, at any time, petition the Agency to review and revise that standard. Any party that believed an existing MACT standard was deficient because it failed to adequately address one or more HAP emitted by the source category could have submitted a petition asking the EPA to consider the new information and amend the existing rule to cure any alleged deficiency.

In addition, as discussed above, the 1998 listing notice provided sufficient notice that the EPA intended to rely on previously issued MACT standards to satisfy the CAA section 112(c)(6) requirement, to the extent that the public did not recognize that it was already on notice regarding the MACT standards' applicability to all HAP emitted by the source categories at the time those standards were issued. If the commenter believed one or more of the

standards listed in that 1998 notice did not adequately address the CAA section 112(c)(6) HAP, it should have filed an administrative petition making the argument that the 1998 notice constituted new information concerning the substance of those previously issued standards and asked the EPA to amend the original rules that established the MACT standards. In fact, as stated above, the commenter filed an administrative petition on several of the rules addressed in its comments and did not challenge the EPA's denial of that 2001 petition. Assuming arguendo that the 1998 notice provided an opportunity to challenge the previously issued MACT standards, any such challenge is now time barred because the commenter should have brought the challenge to those rules within 6 years of the 1998 notice, wherein the EPA included those source categories in the CAA section 112(c)(6) inventory. See 28 U.S.C. 2401(a) (requiring civil actions against the United States to be brought within 6 years after the right of action first accrues). For source categories included in but regulated after the 1998 listing, the commenter was on notice and should have commented directly on surrogacy and other issues at the time the standards were promulgated, even if the EPA did not reiterate in the rulemaking record that the EPA was counting those sources' standards toward the 90 percent requirement.

The commenter's main concern appears to be the EPA's use of "total HAP" or "total organic HAP" as surrogates for certain CAA section 112(c)(6) HAP. The commenter claims such approach is unlawful under the plain language of CAA section 112(c)(6) because according to the commenter that provision requires the EPA to set a MACT standard "*for*" "each section 112(c)(6) HAP." In support, the commenter cites a United States Court of Appeals for the District of Columbia Circuit opinion in a case reviewing the NESHAP for the Gold Mine Ore Processing and Production area source category ("the Gold Mine area source rule"). See *Desert Citizens Against Pollution* v. *EPA,* 699 F.3d 524 (D.C. Cir. 2012). As explained above, the commenter's interpretation of CAA section 112(c)(6) to require a specific MACT standard *for* "each section 112(c)(6) HAP" is unsupported by the plain text of the statute. Unlike CAA section 129(a)(4), the terms of CAA section 112(c)(6) do not direct the EPA to set such standards "for" the section 112(c)(6) HAP. Further, nothing in the United States Court of Appeals for the District of Columbia Circuit opinion or

the Gold Mine area source rule referenced in the comment addresses the issue of surrogacy. This is not surprising considering that rule directly regulates mercury, the only CAA section 112(c)(6) HAP emitted from the Gold Mine area sources. The relevant issue in that case was whether the EPA must also set CAA section 112(d)(2) standards for all of the non-CAA section 112(c)(6) HAP emitted by the Gold Mine area sources. The Court upheld the EPA's interpretation that CAA section 112(c)(6) does not impose such requirement on non-CAA section 112(c)(6) HAP emitted from area sources just because they emit one or more CAA section 112(c)(6) HAP (in this case, just mercury). The commenter also suggests that its claim is supported by the EPA's own interpretation, but does not cite or reference any specific EPA statement. In any event, interpretations and statements the EPA made in support of the Gold Mine area source rule were specific to those area sources and should not be taken out of context.

To the extent the commenter is claiming that a surrogate cannot be a group of HAP (*e.g.,* total organic HAP or total HAP), the commenter's interpretation of CAA section 112(c)(6) contradicts the United States Court of Appeals for the District of Columbia Circuit's decision in *National Lime,* 233 F.3d at 639. In that decision, the Court held that PM, which is itself comprised of a group of pollutants, is a reasonable surrogate for metallic HAP, see *National Lime,* 233 F.3d at 639. Neither PM nor metallic HAP is a single HAP; each has various pollutants as constituents. As the Court holds, the EPA may set surrogate standards for HAP where it is reasonable to do so, see *National Lime,* 233 F.3d at 637. Therefore, a surrogate can be one or multiple pollutants as long as it is reasonable, and the reasonableness of the use of a surrogate can be properly challenged only at the time the standards are promulgated.

For the reasons stated above, the EPA is not required in this action to re-evaluate previously promulgated MACT standards and respond to the belated comments on the substance of these standards, as the commenter claims. Congress deliberately promoted the value of finality of the EPA's standards in requiring parties to challenge rules within 60 days of promulgation under CAA section 307(b)(1), and in precluding opportunities to randomly challenge standards in post-promulgation fora such as civil or criminal enforcement proceedings. See CAA section 307(b)(2). Moreover, nothing in CAA section 112(c)(6) serves as an exception to this emphasis on

finality and regulatory repose, given that CAA section 112(c)(6) itself does not require the EPA to issue any final notice or take any other final action that functions to re-open previously promulgated standards that are credited to meeting the 90 percent requirement. If, in fact, additional control of HAP, including CAA section 112(c)(6) HAP, is appropriate because of remaining risk or newly available control technologies or practices, the CAA addresses that possibility by requiring review of CAA section 112(d)(2) standards pursuant to CAA sections 112(d)(6) and (f)(2). Thus, the commenter has had and will have additional opportunities to address whether additional control of the section 112(c)(6) HAP is warranted.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *http://www2.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was, therefore, not submitted to the Office of Management and Budget (OMB) for review.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the PRA because it does not contain any information collection activities.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. This action will not alter any of the standards discussed in this document.

### D. Unfunded Mandates Reform Act (UMRA)

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538 and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have tribal implications, as specified in Executive Order 13175. This action does not materially alter the stringency of any standards discussed in this document. Thus, Executive Order 13175 does not apply to this action.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

This action is not subject to Executive Order 13045 because the EPA does not believe the environmental health risks or safety risks addressed by this action present a disproportionate risk to children. A health and risk assessment was not performed for this action because it does not alter any of the regulations discussed in this action.

### H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

### I. National Technology Transfer and Advancement Act

This rulemaking does not involve technical standards.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects on minority, low income or indigenous populations because it does not affect the level of protection provided to human health or the environment. An environmental justice evaluation was not performed for this action because it does not alter any of the regulations discussed in this action.

### K. Congressional Review Act (CRA)

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Dated: May 22, 2015.

**Gina McCarthy,**

*Administrator.*

[FR Doc. 2015–13500 Filed 6–2–15; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 180

**[EPA–HQ–OPP–2014–0678; FRL–9927–19]**

## Alkyl (C$_{8-20}$) Polyglucoside Esters; Exemption From the Requirement of a Tolerance

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes an exemption from the requirement of a tolerance for residues of D-glucopyranose, oligomeric, 6-(dihydrogen citrates), C$_{8-20}$ branched and linear alkyl glycosides, sodium salts; D-glucopyranose, oligomeric, 6-(hydrogen sulfosuccinates), C$_{8-20}$ branched and linear alkyl glycosides, sodium salts; and D-glucopyranose, oligomeric, lactates, C$_{8-20}$ branched and linear alkyl glycosides when used as an inert ingredients (surfactants) in pesticide formulations applied to growing crops and raw agricultural commodities after harvest. Lamberti USA, Inc. submitted a petition to EPA under the Federal Food, Drug, and Cosmetic Act (FFDCA), requesting establishment of an exemption from the requirement of a tolerance. This regulation eliminates the need to establish a maximum permissible level for residues of D-glucopyranose, oligomeric, 6-(dihydrogen citrates), C$_{8-20}$ branched and linear alkyl glycosides, sodium salts: D-glucopyranose, oligomeric, 6-(hydrogen sulfosuccinates), C$_{8-20}$ branched and linear alkyl glycosides, sodium salts; and D-glucopyranose, oligomeric, lactates, C$_{8-20}$ branched and linear alkyl glycosides.

**DATES:** This regulation is effective June 3, 2015. Objections and requests for hearings must be received on or before August 3, 2015, and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**).

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OPP–2014–0678, is available at *http://www.regulations.gov* or at the Office of Pesticide Programs Regulatory Public Docket (OPP Docket)